**MELROSE INTERNATIONAL TRADING COMPANY OF CANADA, LTD., a Foreign Corporation, Plaintiff,**

v.

**PATRICK CUDAHY INCORPORATED, a Wisconsin Corporation, Defendant and Third-Party Plaintiff,**

v.

**WISCONSIN COLD STORAGE COMPANY, Third-Party Defendant.**

No. 75–C–335.

United States District Court,
E. D. Wisconsin.

Jan. 28, 1980.

David J. Vergeront, Davis, Kuelthau, Vergeront, Stover & Leichtfuss, Milwaukee, Wis., for plaintiff.

William B. Graves, Godfrey & Kahn, Milwaukee, Wis., for Patrick Cudahy.

Reuben W. Peterson, Jr., Borgelt, Powell, Peterson & Frauen, Milwaukee, Wis., for Wisconsin Cold Storage.

## MEMORANDUM AND ORDER

WARREN, District Judge.

This is a civil action involving the sale of approximately 80,000 pounds of frozen edible pork livers by the defendant Patrick Cudahy, Inc. (PCI) to the plaintiff Melrose International Trading Company of Canada, Ltd. (Melrose). Jurisdiction is grounded on 28 U.S.C. § 1332(a). A seven-day court trial was held on September 19, 1977 through September 27, 1977. At the conclusion of the trial, the Court requested post-trial briefs and proposed findings from each party.

The following constitutes the Court's findings of fact and conclusions of law in this action pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Two separate contracts are involved in this action. The first is a contract between Melrose and PCI for the purchase by Melrose of some 76,000 to 80,000 pounds of pork livers. The second is a continuing service contract between PCI and third-party defendant, Wisconsin Cold Storage Company (WisCold) for WisCold to store and freeze PCI's pork products in WisCold's warehouse.

A review of the testimony presented at trial reveals that on about September 16, 1974, Melrose placed an order to purchase from PCI 76,000 to 80,000 pounds of fresh, frozen, edible pork livers to be delivered in Kenosha, Wisconsin, for transport to Antwerp, Belgium. Melrose's order to PCI was placed through John E. Staren Company (Staren), a Chicago meat broker. The broker "booked" a deal between Melrose and PCI for:

76,000–80,000 lbs. fresh frozen edible pork livers packed in 50 lb. poly-lined, even

weight boxes, marked, strapped, stamped and packed suitable for export to Holland.

On the same day, Staren sent a written confirmation of the contract to both Melrose and PCI. The confirmation provided that:

> The issuance of this confirmation to buyer and seller shall establish a valid contract between both parties. . . .

This confirmation (Exhibit 1) which is the written embodiment of the contract between Melrose and PCI calls for shipment to be made during the last week of September, 1974, to Melrose, c/o Morelli Overseas Export Service (Morelli) *F.A.S. Kenosha, Wisconsin* (emphasis added).

On September 18, 1974, Melrose issued its confirmation of purchase to PCI for:

> . . . 76/80,000 lbs. Fresh Frozen U.S.D.A. Inspected Pork Livers packed in 50 lb. poly-lined cartons suitable for Export to Holland.

PCI slaughters, processes, and packages numerous varieties of meats. The slaughtering and processing of all meat in the United States is regulated by the United States Department of Agriculture (USDA). In this case, the USDA inspectors at PCI made a postmortem inspection of the pork livers during the slaughtering and evisceration. A further inspection of the pork livers was conducted just prior to their shipment from WisCold to the plaintiff.

During September 1974, PCI processed the pork livers—packing 50 pounds of livers in each carton. Nick Klisurich, supervisor of the Abbatois at PCI, and a 30-year employee of PCI, testified at length regarding the packing process.[1] According to his testimony, dry ice was used in the packing process in September, 1974, although a different procedure is used today. At that time, after the pork livers were trimmed, they would go to the packer at PCI. The packer would spread three pounds of dry ice

in the bottom of the packing carton, which had a plastic liner in it. Trimmed pork livers were placed in this 50-pound carton until it was about one-half full. About one pound of dry ice was spread on top of these livers and the remainder of the carton was then filled with pork livers. Two more pounds of dry ice was placed on top of this, and the carton's liner was folded over the top of the livers. The cover, which had holes in it to allow the carbon dioxide to escape, was then placed on the carton.

These filled cartons were placed on pallets two layers high with spreaders in between. Spreaders were used to allow more air circulation between the cartons to facilitate freezing. Twenty cartons were placed on each load. These were then placed in a cooler where the temperature was about $32°–36°$ F. The livers were stored in the cooler until they were picked up by WisCold. There was no testimony, however, as to how long the livers remained in the cooler at PCI.

By virtue of an ongoing servicing contract between WisCold and Patrick Cudahy, WisCold had, since 1972, been picking up meat products at Patrick Cudahy and transporting them by refrigerated truck to its freezer warehouse. The pork livers involved in this action were among the goods thus transported. Upon receipt by WisCold, the livers were placed in a freezer until ordered out by PCI.

The freezing facilities at WisCold were constructed in 1970 with heavy refrigeration capabilities (1,680 tons) for the purpose of being able to receive and process 500,000 pounds of cranberries per day. Although not a "blast freezer" it was constantly monitored and portable fans on casters, capable of moving 500–700 cubic feet per minute of air were utilized in the facilities.

On twelve separate days between September 4, 1974 and September 26, 1974,

---

1. While extensive testimony was taken regarding the packing process throughout the whole trial, none of the parties presented any evidence regarding the time it took to get the pork livers prepared for packaging. There is no evidence in the record as to the lapse of time between the slaughter of hogs and the evisceration process or between evisceration and the actual packaging of the livers at PCI. This is particularly curious in light of pork's greater susceptibility to spoilage.

WisCold picked up and stored PCI's pork products in its freezer warehouse, including some 78,000 pounds of pork livers which arrived in varying amounts on each of these twelve days. The pork livers sold to Melrose were part of Lots 2043 and 2063.

The transfer was by refrigerated truck, owned by WisCold and driven by a WisCold employee. The shuttle truck was refrigerated to maintain a temperature of approximately 40 degrees. The last truckload each day was held in the refrigerated truck overnight and unloaded the next morning, except that no loads were held unloaded over weekends.

According to WisCold's daily temperature logs for September, 1974, the temperature in the freezer was never higher than −8° Fahrenheit. Freezer temperatures were checked twice each day at 6:00 A.M. and 6:00 P.M. The freezer was closed at noon on each Saturday and not opened until 6:00 A.M. Monday. An automated alarm system with the Merchant Police provided coverage during the weekend. There was no shutdown in the freezer during September, 1974.

The president of WisCold, James Kuehn, testified that fans are put in front of the pallets of fresh products in order to circulate the air and promote faster freezing. In addition, he stated that, depending on the position of the pallet, it would take 40 to 60 hours at temperatures of −10° to −12° F. to freeze the pork livers in these 50-pound cartons. According to Mr. Kuehn, WisCold's practice is to attempt to keep products for four days to ensure that all are properly frozen.

Although Mr. Kuehn acknowledged that he was not a microbiologist and was not an expert in meat spoilage, he had worked in the freezer warehouse business for some 38 years. According to Mr. Kuehn, the pork livers were well-frozen when they left the WisCold plant. In his opinion, the spoilage was caused because the livers were subsequently allowed to thaw out to a temperature range of 25° to 30° F. and that the refrigeration required to quickly refreeze the pork livers was not available so the livers were refrozen at a slow rate causing the centers to spoil.

On September 27, 1974, PCI instructed WisCold to withdraw 72,600 pounds of pork livers for export and gave Melrose's name and address.

Mr. Kuehn testified that before any goods could be exported, a United States Department of Agriculture inspector (USDA) must inspect the goods and issue an export certificate. WisCold applied for an export certificate with the USDA on September 27, 1974. On the same day, a USDA meat inspector came to the WisCold freezing facility and randomly selected from Lots 2048 and 2063 nine cartons of pork livers for inspection, pursuant to USDA regulations. The cartons were sealed and placed in a tempering room in which the temperature was 80°–85°. The next morning, the meat inspector returned to WisCold and inspected the pork livers in a thawed condition. He determined that the pork livers were in wholesome condition.

On September 30, 1974, a USDA export certificate was issued for the 1,452 cartons of pork livers in issue, over the signature of USDA inspector, Mathew Henk reciting that the shipment was "from animals that received antemortem and postmortem inspection and were sound and healthy and it has been inspected and passed as provided for by law and the regulations of the Department and is sound and wholesome." A USDA stamp was placed on each carton. None of the pork livers were inspected in a frozen condition.

On that day, these 1,452 cartons, each containing 50 pounds of pork livers, were withdrawn from WisCold's freezer and delivered to LCL Transit Company (LCL Transit). Donald Sekorky of LCL Transit testified that the cartons were held overnight in the terminal, that the temperature was checked every three hours, and that the temperature required to be maintained was, according to the Bill of Lading, 0° or lower.

According to the testimony and the documentary evidence of Exhibit 54 and Exhibit 10, early the following morning, October 1,

1974, LCL Transit transported the cartons by trucks to Morelli in Kenosha, Wisconsin, where they were unloaded the same day.

At this point, there is a significant gap in the history of the goods. The Court was unable to find a shred of evidence establishing how the livers were handled by Morelli once they had been unloaded on October 1 and before they were onloaded to the vessel on October 4.

On October 4, 1974, the cartons were loaded aboard the vessel, SALTA, for transportation to Belgium. Melrose paid to PCI the agreed total purchase price of $12,-705.00 for the pork livers.

The remaining pounds of pork livers, stored and frozen by WisCold for PCI during this period, were withdrawn and shipped to other customers. No complaints about the wholesomeness of these livers were received by PCI.

As noted above, no evidence was presented as to how the pork livers were handled at Kenosha, Wisconsin, from October 1, 1974 to October 4, 1974, when they were loaded onto the vessel, SALTA, nor was there evidence of handling from October 4, 1974 to October 31, 1974, while they were aboard the SALTA. There was also no evidence presented at trial as to the handling of the pork livers from October 31, 1974 to November 22, 1974, when the liver shipment was first examined by the ultimate purchaser, Selecta S.A. (Selecta), a Belgium corporation, which had purchased the pork livers from Melrose for $17,452.90 shortly after Melrose bought them from PCI. The only thing that is known about the goods after they were delivered to Kenosha, Wisconsin, is that they arrived in Antwerp, Belgium, on October 31, 1974 and were subsequently transported to a local cold storage warehouse at Kortrijk, Belgium.

On November 22, 1974, Selecta notified Melrose by telex that twenty cartons of the shipment of pork livers had been defrosted by Dr. Frans Iserbyt, a licensed Belgian veterinary inspector and found to be "unfit for human consumption" and that Selecta rejected acceptance of the shipment. Melrose on the same day notified Staren by telex regarding the condition of the shipment and advised that a survey would be held on November 28, 1974.

On November 25, 1974, Melrose again notified Staren that an additional 20 cartons had been thawed and inspected; that this had revealed that "the interior of the liver was green, rotten, smelling and slimy which meant that the product was not frozen properly," that a survey would be held on November 26, 1974, and that Melrose would hold PCI responsible for all losses incurred.

By telephone conversations on November 25, 1974, and by confirming letter that same date, Staren notified PCI of the telexes and the condition of the pork livers and that an inspection would take place on November 26, 1974. PCI did not request a delay of the survey to permit a representative to attend, and no representative of PCI attended any of the surveys conducted.

On November 22, 1974, Captain Jacques Van Havre, a marine surveyor, was contacted and asked to examine the shipment to determine the nature and cause of the damage. As a marine surveyor, he had examined numerous cargoes of frozen meat, including frozen pork livers, to determine the cause of damage. At that time, the pork livers were being stored in two refrigerated trailertrucks.

Prior to his inspection on November 26, 1974, Captain Van Havre requested that approximately 27 cartons of pork livers be thawed in advance for his inspection. When he examined the thawed pork liver blocks, he testified that they had pale, putrid centers, and that decomposition was evident from the center of the carton outward.

Captain Van Havre also inspected numerous frozen cartons which he randomly selected while supervising the moving of goods from the trucks to a warehouse. His examination of the cartons include an examination of the outside of the cartons, which revealed no damage, and the inside of the cartons, which revealed no staining, streaking or discoloration.

As a result of his inspection, Captain Van Havre concluded that there was a latent defect in the livers when they were shipped and that, in his opinion, the decomposition of the livers was definitely not caused by a thawing and subsequent refreezing of the pork livers. He was of the opinion that the spoilage of the pork livers occurred because of improper freezing in the initial freezing process.

Captain Van Havre based his opinion that the livers had not been thawed and refrozen on seven factors he observed: (1) the external condition of the cartons were not damaged and crumbled; (2) the inside face of the containers was not stained or streaked; (3) the rime, which was considerable in amount, was white with no trace of blood; (4) there were no stained crystals that are generally found when food is thawed and refrozen; (5) there was no drip loss on the bottom of the cartons; (6) the discoloration was evident from the center of the cartons outward; and (7) the drip loss was considerable when the livers were thawed.

Based on his examination and analysis, Captian Van Havre unequivocally concluded that the problem began when the goods were initially put in the containers. He stated that goods were too warm when frozen and certain bacteria caused the deterioration of the pork livers.

At the suggestion of Captain Van Havre, Dr. Iserbyt took some samples to the Municipal Laboratory of Kortrijk for a bacteriological analysis which reported thereon as follows: "numerous coli and common germs, abnormal odour, close to decay and unfit for human consumption."

On January 16, 1975, Captain Van Havre was in attendance when more random samples of the shipment of pork livers were examined by the firm of A. Kiewit, International Loss Adjusters and Surveyors, on behalf of Melrose. He again inspected thawed and frozen samples selected at random and his observations were the same as those which he had made at his initial inspection on November 26, 1974.

Dr. Richard Mikita, a member of the USDA's overseas meat inspection staff, examined the spoiled livers on February 7, 1975. He had extensive experience in the inspection of meat products but indicated that he was not an expert in the freezing process. He testified that, in a frozen state, the liver blocks appeared normal. However, the thawed cartons of livers had putrid centers with veins of spoilage leading from the centers to the bottoms and sides of the containers. In his report to his superiors (Exhibit 27), he concluded the livers were unwholesome but did not indicate an opinion as to the cause. Some time after this final inspection, the pork livers were sold as animal food for $4,475.00.

In his trial testimony, Dr. Mikita opined that the spoilage was caused by a lack of proper chilling before placing the livers in the cartons. When the livers were later frozen, the outside surface froze first and the inside was still warm. Bacteria then had an opportunity to grow and multiply. Dr. Mikita concluded, based on his observations and examination, that what he described as the "hot spot" causing the spoilage was present prior to the arrival of the goods in Belgium.

Dennis Lonergan, a doctoral candidate in the Food Science Department at the University of Wisconsin, testified that he conducted three experiments on the freezing of pork livers in June, 1977. In these experiments, the pork livers were frozen at various rates, and the temperatures of the pork livers were monitored during the freezing process.

Sample cartons were selected, opened and examined seventeen days after the boxes were placed in the freezers. The examination revealed no detectable off-odors in any sampled liver and no detectable spoilage due to microbiological causes. The experiment indicated that the slowly frozen livers, although not apparently spoiled, showed considerable and significant microbiological growth.

Based upon the experiment's results, the written report submitted by Raymond J. Winger of the University of Wisconsin Food Science Department stated:

There is justification to suggest that liver boxes be frozen to 0° F. as rapidly as

possible, even within a limit of, say 80 hours. . . . Although the slower freezing times do not appear to result in spoilage of the livers, the shelf life (after thawing) will be significantly shorter for slowly frozen livers. Faster freezing will allow more abuse before freezing (e. g. while packaging) and while thawing before spoilage occurs. (Defendant PCI's Exhibit 57).

Dr. Owen Fennema, Professor and Chairman of the Department of Food Science at the University of Wisconsin, testified at trial that if the livers were handled as described in the three experiments, i. e., if they were in cold storage for some 96 hours and were withdrawn and held in refrigerated trucks at 0° F. overnight and then delivered to a buyer, the pork livers should not have been spoiled.

In his opinion, the spoilage probably occurred while the goods were in transit to Belgium. He stated that the frozen pork livers could have been subjected to too high a temperature at some point causing a thawing of the livers. Dr. Fennema did not, however, actually inspect the pork livers in issue or the cartons in which they were shipped.

With respect to the amount of rime that Captain Van Havre observed, Dr. Fennema stated that rime is usually present in frozen commodities and that more rime is present if a commodity is thawed and refrozen. He also testified that slowly frozen products normally exhibit high drip loss. Therefore, according to Dr. Fennema, if there was no evidence of blood drippings at all, then no thawing at all would have occurred.

Dr. Fennema also testified that fast freezing is not harmful and that a frozen outer crust actually helps freeze the center of the product more rapidly. According to his testimony, the use of dry ice as a chilling agent on raw livers is an entirely acceptable procedure and would facilitate freezing. However, he said, if it took an excessively long time to freeze the pork livers, the spoilage could have occurred as a result of this slow freezing process.

Dr. William Brown, who has a doctorate degree in food microbiology, testified that he had never seen a core of putrefaction and veins of spoilage extending outward from the center of pork livers as described by Captain Van Havre and Dr. Mikita. Based on his experience and training, Dr. Brown's opinion was that spoilage occurred when the livers were subjected to fairly warm temperatures after the inspection by the USDA inspector in September, 1974, and before the pork livers arrived in Belgium. He discounted the lack of discoloration in the cartons because he believed that the plastic liners were large enough to enclose the livers and prevent any leakage.

Plaintiff alleges four theories of liability against the defendant: (1) breach of contract; (2) breach of warranty; (3) negligence; and (4) strict liability.

Plaintiff seeks basic and incidental damages in the amount of $23,538.16, loss of earnings from the transaction with PCI in the amount of $1,089.00, and loss of reasonably anticipated net earnings from Selecta for a period of 34 months in the amount of $270,969.46. On all four causes of action, plaintiff has the burden of proving its case by a preponderance of the evidence.

## CONTRACT

The contract involved in this case originated on September 16, 1974 when Melrose placed an order to purchase the pork livers from PCI with John E. Staren Company of Chicago, a commodity broker. The offer to buy and the agreement to sell were made over the phone and memorialized in Staren's "confirmation" dated September 16. (Exhibit 1). Under the contract, PCI had a duty to deliver 76,000–80,000 pounds of "fresh frozen edible Pork Livers packed in 50 lb. poly-lined even weight boxes, marked, strapped, stamped and packed suitable for export to Holland." The product was to be shipped via seller's truck from Cudahy, Wisconsin. F.A.S. Kenosha, Wisconsin. The form of exhibit 1 provided:

. . . The issuance of this confirmation to buyer and seller shall establish a valid contract between both parties. . .

, Because the contract was for a sale of goods, it is governed by the Uniform Commercial Code (UCC) which has been adopted by Wisconsin. Wis.Stat. § 401.110.

If PCI met its responsibilities under this contract, there would be no breach thereof. Under the UCC, the term F.A.S. translates to "free alongside" and requires the seller ". . . [a]t his own expense and risk to deliver the goods alongside the vessel in the manner usual in that port or on a dock designated and provided by the buyer." Wis.Stat. § 402.319.

In its reply brief, plaintiff notes that the parties to a contract may vary the effect of provisions of the UCC by specific agreement citing Sec. 401.102(3) of the Wisconsin Statutes.

> The effect of provisions of this code may be varied by agreement, except as otherwise provided in this code . . . .

Then plaintiff points to exhibit 2, the Confirmation of Purchase issued by Melrose on September 18, 1974. That document under "General Conditions" provides:

> All products furnished must be as specified by Purchaser, and will be subject to inspection and approval of purchasers before and after delivery. Purchasers reserve the right to reject and return at the risk and expense of the supplier, all or any portion of the shipment which may be defective or fail to comply with specifications.

Plaintiff contends that this language varies the contract and alters the point at which risk passes to the buyer.

■ As the Court views the evidence, this argument must fall because the parties already had a binding contract on September 16 that, under sec. 402.319, Wis.Stats., would transfer the risk of loss when the commodity was delivered in good condition "free alongside" the SALTA in Kenosha. The Court could find no evidence that there was a modification assented to by both parties that would make the operation of the F.A.S. terms inapplicable. Melrose, by merely sending out a confirmation form cannot, without the assent of the seller change a material term of a contract already made. *See* Wis.Stat. § 402.207. It

should be noted that exhibit 2, upon which this contention rests, is itself internally inconsistent because the same paper which contains the "General Conditions" set forth above also contains the F.A.S. provisions.

■ In addition, even if the Court were to accept plaintiff's theory that the above provisions were part of the contract, plaintiff would not prevail. The provisions required plaintiff to inspect the products which was not done in this case. Furthermore, because the time for inspection is not stated, a reasonable period would be implied under the UCC, and it is clear from the facts that plaintiff failed to exercise its right to inspect within a reasonable time after delivery.

■ The journey of goods from seller to buyer is fraught with risk and this risk is particularly perilous when the goods are perishable and must travel overseas. From a policy point of view, there are various ways in which the law might allocate a loss occurring during such a journey. Suffice it to say that the UCC has allocated the loss to one or the other of the two contracting parties depending upon: (1) the parties agreement; (2) whether one party or the other is in breach; and (3) the moment in the transaction when the loss occurred. J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, 134 (1972).

Having determined that the agreement between the parties was subject to the U.C.C. and that it required shipment to Morelli F.A.S., Kenosha, the Court must then examine the evidence with regard to the other two factors.

■ Under section 402.510 of the Wisconsin Statutes, the risk of loss does not pass to the buyer if at the time of delivery or tender, the seller is in breach of the contract. In those instances, even if the risk would pass under the second factor cited above, the buyer must show that the seller breached its contract in order to keep the risk of loss from shifting to him.

In the case at bar, the goods were delivered alongside the SALTA on October 1,

1974 and, pursuant to the contract, accepted there by Melrose. Any finding of a breach of contract on the part of PCI would require that the Court accept the opinion evidence of Captain Van Havre and Dr. Mikita regarding their "hot center" theory and improper chilling or handling in the initial freezing—and then retroactively attach the breach to some point prior in time to the delivery to Melrose's agent, Morelli. Any such retroactive attachment, on the basis of the evidence is arbitrary and speculative. While both of these witnesses impressed the Court as truthful, observant individuals, neither was truly an expert in the chemistry or physics of either freezing or the breakdown of proteins under nonrefrigerated conditions. One was a meats specialist and one a general cargo damage specialist. Both examined the meats but made no other physical investigation of the conditions of carriage. Both espoused the theory that inadequate chilling or too fast freezing had created an insulated barrier of frozen material around a center that was still warm enough to cause spoilage, and in this case, putrefaction. Their opinions were based upon a single objective observation, i. e., the condition of the pork livers.

Drs. Fennema and Brown presented opinions diametrically opposed to those of Van Harve and Mikita. Neither of these experts had actually examined the livers, although both had familiarized themselves with the evidence and exhibits. Their fields of expertise were, however, in the Court's view, closer to the crucial issues of the case. Both indicated that the "hot center" theory, as a basis for establishing how and when the damage occurred, was contrary to scientific fact. Dr. Brown in his testimony stated: that all products freeze from the outside in; that the frozen exterior was no barrier to cooling the interior; and, that ice in fact will move heat out from the center four times as fast as water.

In addition, the USDA inspection certificate of September 30, 1974, showed the pork livers, when examined in a thawed state, were in a wholesome condition. The testimony of the various experts conflicted as to the cause of the spoilage. Standard packing and freezing procedures were in use at both PCI and WisCold during September, 1974. There was no evidence of any change in routine or malfunctioning of equipment at either company during this time period. Finally, the Court was presented with no evidence as to the care and handling of the pork livers after delivery in Kenosha, Wisconsin.

The Court was faced with a difficult decision in light of the adverse testimony of the witnesses. On balance, however, it was persuaded there was nothing in the testimony or exhibits to satisfy it by a preponderance of the evidence that PCI or WisCold caused the damage and that the spoilage occurred because of faulty chilling or freezing procedures prior to delivery to Kenosha. Therefore, the Court concludes that the defendant did not breach its contract with the plaintiff and that the pork livers conformed to the contract when they were delivered to Kenosha, Wisconsin.

Based upon these conclusions it is apparent that the loss must have occurred sometime after the delivery to Kenosha and while the livers were under the control of the plaintiff and its agents. Therefore, in accordance with the third factor cited above, there is no basis for finding any liability under the contract.

## NEGLIGENCE AND WARRANTY

▉ With respect to the negligence claim, a breach of a contractual duty may constitute actionable negligence in Wisconsin. *White v. Benkowski*, 37 Wis.2d 285, 155 N.W.2d 74 (1967); *Colton v. Foulkes*, 259 Wis. 142, 47 N.W.2d 901 (1951). In *White v. Benkowski, supra*, at 292, 155 N.W.2d at 78, the court stated:

. . . the contract creates the relation out of which grows the duty to use care in the performance of a responsibility prescribed by the contract.

▉ Plaintiff must, of course, prove a breach of this duty, the causal connection between the conduct and the injury, and the actual loss or damages resulting from the injury.

Therein lies the problem in the Court's view. This is a case determined by examination of the burden of proof. There can be no doubt that 1,452 cartons of pork livers shipped to Belgium pursuant to the contract between Melrose and PCI spoiled and at some point became unfit for human consumption. Plaintiff contends that PCI breached both its duty to exercise reasonable care in processing, chilling, freezing, and transporting of the product and its duty to deliver at Kenosha livers as warranted. It relies upon what defendant WisCold in its brief characterizes as a variation of a *res ipsa loquitur* theory—since the pork livers were unwholesome when examined in Europe on November 26, 1974, the cause must be PCI's failure to properly freeze.

This characterization by defendant is, of course, factually inappropriate since the doctrine of *res ipsa loquitur* requires proof that the thing which caused the injury was under the control and management of the defendant, and that the occurrence was such as in the ordinary course of things would not happen if those who had its control or management used proper care. 58 Am.Jur.2d Negligence § 474. Nonetheless, the characterization has a certain appeal in describing the line of reasoning advanced by plaintiff. The livers were putrid when they were examined in Belgium, "a fortiori" the packer breached its contract, its duty, or its warranty.

■ This line of reasoning, however, is inconsistent with the facts because the Court has already found that the damage did not occur while the pork livers were in the control of either of the defendants. Moreover, as stated earlier, Melrose has not accounted for or offered any proof as to the handling of the goods from October 1, 1974, when they were delivered to Melrose, to October 4, 1974, when the livers were loaded aboard the Salta. Nor, was there any proof of their handling during the voyage, offloading, transportation and storing in Belgium. Throughout this period, the livers were under the care and control of various third parties whose identities are unknown and whose procedures and techniques are equally unknown.

## BREACH OF WARRANTY

■ Any liability for breach of warranty would in like fashion hinge upon a showing that the pork livers delivered to Melrose at Kenosha were other than "fresh frozen edible pork livers . . . suitable for export to Holland." Absent such, there could be no recovery. As stated earlier, there is no proof that the livers were not "edible" and "suitable for export to Holland" when they left the control of PCI and WisCold.

Reduced to its simplest dimensions, there being no proof that anything went amiss prior to the transfer of risk at Kenosha, the plaintiff must found its case upon the Court's willingness to accept the very generalized opinion evidence of Captain Van Havre and Dr. Mikita over the generalized opinion evidence of Drs. Fennema and Brown, and then draw the conclusion that defendants caused the damage. The Court has already reviewed that dilemma it faces here.

While Captain Van Havre and Dr. Mikita both testified that improper freezing in the initial freezing process caused the pork livers to spoil, Dr. Fennema and Dr. Brown both indicated that the spoilage was caused by a partial thawing and subsequent refreezing of the livers at a slow rate, sometime after the goods left WisCold for transport to Belgium.

Testimony was also presented as to the packing and freezing procedures utilized at PCI and the freezing process used at WisCold in September, 1974. No complaints were received about the wholesomeness of the remaining pounds of pork livers from PCI that were stored and frozen by WisCold during September, 1974, and delivered to other PCI customers.

After careful consideration of all the evidence, this Court finds that plaintiff has not shown that defendant PCI breached its contract and warranty with plaintiff or that the alleged negligence of PCI caused the spoilage of the pork livers in issue.

## STRICT LIABILITY

■ With respect to plaintiff's cause of action based upon strict liability, plaintiff

must prove in part that (1) the product was in a defective condition when it left the possession or control of the seller; (2) that the product was unreasonably dangerous to the user or consumer; and (3) that the product reached the user or consumer without substantial change in the condition it was in when it was sold. *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967).

Based upon the evidence presented, the Court concludes that plaintiff has failed to prove by a preponderance of the evidence that the pork livers were in a defective condition when they left PCI or WisCold.

In light of the foregoing, this Court holds that plaintiff's complaint against PCI must be dismissed upon its merits.

The third party complaint of PCI against WisCold is likewise dismissed upon its merits.